## BOB TERRELL v. STATE.

No. A-1698.  Opinion Filed February 28, 1914.

(138 Pac. 1039.)

HOMICIDE—Manslaughter—Sufficiency of Evidence. In a prosecution for murder, the evidence examined, and held sufficient to support the verdict of manslaughter in the second degree, and that no prejudicial error was committed upon the trial.

*Appeal from District Court, Carter County;*
*S. H. Russell, Judge.*

Bob Terrell was convicted of manslaughter in the second degree, and brings error. Affirmed.

*H. H. Brown, Wm. Pfeiffer,* and *Cruce & Potter,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

ARMSTRONG, P. J.  Plaintiff in error was tried on a charge of murder and was found guilty of manslaughter in the

second degree, and his punishment was assessed at imprisonment in the penitentiary for the term of four years. From the judgment of conviction he appeals.

The facts of the case are few and simple. Practically none of the testimony on the part of the state was denied by the defendant. The deceased, Joe F. Robison, and the defendant Bob Terrell, were both residents of Ardmore. The deceased, at the time of his death, was 53 years of age, the father of two grown children. He had lived in Ardmore for 23 years. The defendant was a younger man, and at the time had been a resident of Ardmore for about five years. At the time in question the defendant was engaged in conducting a rooming house, and had a woman, one Nora Wilson, in charge of the same. Monte Wilson, her brother about ten or twelve years of age, was then staying at the rooming house, and it was over him that the trouble occurred which eventually resulted in the death of Robison. On the night in question a show was presented at the Robison opera house, of which the deceased was the proprietor and manager. Monte Wilson attended the show, and he afterwards reported to his sister Nora Wilson that during the performance Joe Robison, the deceased, had slapped him, and put him out of the opera house. The sister reported this occurrence to the defendant, Terrell, and it then appears that Terrell left the rooming house and went out upon the Main street of Ardmore. This was about 11 o'clock that night. After the show, as was his habit, Robison went to the postoffice, which was located three blocks east of the opera house. Whether Terrell knew of this habit of Robison does not appear from the record, but it does appear that the place that he met Robison was on Main street at a point between the post office and the opera house. Just prior to their meeting Robison had stepped into Hotchkiss' jewelry store, and was holding a conversation with Mr. Hotchkiss, when Terrell approached him and told him that he would like to talk to him. They stepped out of the store and stood on the sidewalk; Robison facing south with his back towards the store and leaning against an iron post at the entrance. It was here that the difficulty took place. There

were no living eyewitnesses to the entire transaction except the defendant.

The, following witnesses saw and heard parts of it: J. B. Blazier, O. W. Jones, Frank Taylor, Albert Roberts, Edgar Son, Will Farthing, Mrs. Marie Malis, and C. W. Hotchkiss. Their testimony in a measure differs in minor details from that of the defendant; but, as the assault is admitted by him, a statement of their testimony is unnecessary.

The defendant as a witness in his own behalf testified: That on the night in question he gave the boy Monte Wilson 50 cents to go to the show. That after the show was over he saw the boy "and he was kind of snubbing," and he told him the big fat man that sells tickets had slapped him. That he was on his way to a restaurant to get a cup of coffee. His testimony is then, in part, as follows:

"Q. Did you see Mr. Robison any more that night? A. Yes, sir. Q. Where did you see him? A. Just as I walked down the street, he walked out of Mr. Hotchkiss' jewelery store. He and Mr. Hotchkiss walked out of the store, and Hotch turned back, and I says, 'Uncle Joe, I would like to speak to you if you are through with Hotchkiss,' and he said, 'All right.' I said, 'You slapped a little boy up at the opera house tonight?' and he said, 'Yes.' I says I would like to know what he was doing. He said he was cutting up. I says that is not a very good cause to slap a child. He says, 'I got fretted and I slapped him.' I says: 'If he goes up there any more, Mr. Robison, you have him arrested; don't slap him. And if I feel like it, I will take him out of jail.' He says, 'I have been running that opera house six or seven years, and you are the first man that ever told me how to run it.' I says, 'I ain't telling you how to run it,' and he says he was fretted, and I says, 'I am fretted too,' and I struck him with my left hand. Q. Did you have anything in your hand? A. No, sir. Q. Do you know what was the result of that lick? A. He sat down—just sunk down—more than he was knocked down, and he kind of pitched over forward, and I raised him by the shoulders, and he was so heavy I couldn't raise him up, and Mr. Hotchkiss took hold of him and helped me."

On cross-examination he stated that before he met the boy he had been told by Nora Wilson, who had returned from the show to the rooming house, that Robison had slapped her brother,

and that he then went down on the street and there met the boy. He further stated that the deceased had made no effort to strike him; that he had previously been twice convicted of violations of the prohibitory liquor law.

The undisputed facts show that the defendant was seeking to bring on a difficulty, and his assault upon the deceased was without provocation and was unjustifiable and inexcusable.

Robison lived for five days. Immediately after the assault he was unconscious for five or six minutes. After that he said he was all right and walked home by himself. The next morning he appeared dazed, and a local physician was called and attended him. That afternoon he had recovered sufficiently to walk down town, and he continued to be about until the fifth day, when he was taken with severe pains in the chest, back, and left side. A physician was again called and administered to him, but a short time after the doctor left he died. A *post mortem* examination was held, conducted by Dr. Booth, assisted by Drs. Hardy and Bogie. These doctors testified that the injury received from the blow, or the fall attendant upon the blow, caused blood clots to form in the heart from which he died. The contrary view was taken by Drs. Moore, Son, and Hargraves, although neither of them could give any reason for the formation of the blood clots in the heart in this instance, except to say that there were other general causes for the formation of such clots. This was the only question in the case. Did the defendant's blow cause or hasten the death of Joe F. Robison? If the injuries sustained at the time of the infliction of the blow were the primary cause of death, or contributed to hasten death, then the defendant under his own statement is guilty of the crime of manslaughter in the first degree.

The conviction being for manslaughter in the second degree only, the errors assigned, even though they were well founded, would not be prejudicial to the defendant. The brief filed in his behalf is without citation of a single authority to support the contention therein made. We have carefully examined the whole record and fail to find any fundamental error. Nothing occurred during the trial to the prejudice of the substantial rights of the

defendant. Under his own testimony he committed an unprovoked and unwarrantable assault and battery upon the deceased, and the jury found, upon the only controverted issue of fact, that the deceased died as a result of the injuries sustained from the effects of such assault and battery.

Perceiving no prejudicial error in the record, and the evidence being amply sufficient to support the verdict, the judgment of conviction is affirmed.

DOYLE and FURMAN, JJ., concur.